IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MADISON COLLINS, JR.,                              )
                                                   )
            Plaintiff,                             )
                                                   )    Civil Action No.  07-497 (ESH)
      v.                                           )
                                                   )
METROPOLITAN WASHINGTON                            )
COUNCIL OF GOVERNMENTS, *et al.*                   )
                                                   )
            Defendants.                            )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, the Metropolitan Washington Council of Governments ("MWCOG") and

Marie Ricasa ("Ricasa"), by their undersigned counsel and pursuant to Federal Rule of Civil

Procedure 56 and Local Rule 56, respectfully submit this memorandum of points and authorities

in support of their motion for summary judgment.

Plaintiff initiated this action on March 15, 2007 by filing a rambling nine (9) page

Complaint in this Court, with no numbered paragraphs.  On August 17, 2007 the Plaintiff filed a

(17) page Amended Complaint, with numbered paragraphs, but the Amended Complaint is still

rambling and lacks focus.  Nevertheless, it is clear that this is an employment discrimination

action wherein the Plaintiff alleges that he was discriminated against because of his race – black

(African-American)  and gender – male,  in violation of Title VII of the Civil Rights Act of 1964,

42 U.S.C. §2000e *et seq.* amended complaint.  The Plaintiff also alleges an assault by a co-

worker, Defendant Ricasa, claiming she closed a door on his hand.

In support of this motion are the attached affidavits of Calvin Smith and Marie Ricasa.

Defendants also rely upon their Statement of Material Facts Not In Dispute.

The Plaintiff is an African-American male whose employment was terminated (the Plaintiff resigned instead of being fired) by an African-American male, Calvin Smith, who was also the same person who hired the Plaintiff. The Plaintiff's employment was ended for well documented performance problems. He was replaced by an African-American male. Thus, an African-American male hired the Plaintiff, the same African-American male made the decision to terminate the Plaintiff's employment, and he replaced the Plaintiff with an African-American male. Based on these facts, summary judgment dismissing the case is warranted.

The Plaintiff in his deposition argues that he reported to Nancy Rea, and that she was the one who recommended to Mr. Smith (who is Ms. Rea's boss) that the Plaintiff's employment be terminated. However, the Plaintiff does no better even if Ms. Rea was the decision maker. The Plaintiff testified Ms. Rea asked to have the Plaintiff work for her and she sought it out, and for several months there was no problem between Ms. Rea and the Plaintiff. The problem only started when the Plaintiff sent an e-mail to the Executive Director complaining that his hand injury was not being taken seriously. Thus, even if the Plaintiff can present evidence that Ms. Rea was the decision maker (and it is unclear how he would know what Mr. Smith based his decision on and thus how to refute Mr. Smith's affidavit), the Plaintiff is limited by the case law that if the same person hires and fires a person, there is a strong inference that there was not a discriminative motive.

In further support of this motion for summary judgment, Defendants have filed an accompanying memorandum of points and authorities. A proposed order is also attached to this motion.

## CONCLUSION

Defendants' motion for summary judgment should be granted.

Respectfully submitted,

2

METROPOLITAN WASHINGTON COUNCIL
OF GOVERNMENTS and MARIE RICASA


By    _____/s/ Lawrence P. Postol_____
      Lawrence P. Postol, DC Bar No. 239277
      James M. Mesnard, DC Bar No. 404385
      Their Attorneys

SEYFARTH SHAW LLP
815 Connecticut Avenue, N.W., Suite 500
Washington, DC  20006-4004
(202) 463-2400

Dated:  February 4, 2008

3

<u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing Defendant's Motion for Summary Judgment

was served by first class mail, postage prepaid, this 4th day of Febraury, 2008, upon:

> Madison Collins, Jr.
> 7157 Marbury Court
> District Heights, MD 20747

<u>/s/ Lawrence P. Postol</u>
Lawrence P. Postol

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MADISON COLLINS, JR.,                    )
                                         )
          Plaintiff,                     )
                                         )        Civil Action No.  07-497 (ESH)
     v.                                  )
                                         )
METROPOLITAN WASHINGTON                  )
COUNCIL OF GOVERNMENTS, *et al.*         )
                                         )
          Defendants.                    )

## ORDER

Upon consideration of the Defendants' Metropolitan Washington Council of Governments and Marie

Ricasa's Motion for Summary Judgment,  including the supporting affidavits and memorandum, and

Defendants' Statement of Material Facts Not in Dispute, and Plaintiff's response to same, it is hereby

## ORDERED

1.    The Motion for Summary Judgment is granted, and

2.    Plaintiff's Amended Complaint is dismissed with prejudice.


_____          _____
                Judge                              Dated


Serve:

Madison Collins, Jr.
7157 Marbury Court
District Heights, MD  20747
(301) 516-7756
eli6elon4@aol.com

Pro Se Plaintiff

Lawrence P. Postol, DC Bar No. 239277
James M. Mesnard, DC Bar No. 404385
SEYFARTH SHAW LLP
815 Connecticut Avenue, N.W., Suite 500
Washington, DC  2006-4004
(202) 463-2400
Lpostol@seyfarth.com

Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MADISON COLLINS, JR., )
)
    Plaintiff, )
)   Civil Action No. 07-497 (HHK)
    v. )
)
METROPOLITAN WASHINGTON )
COUNCIL OF GOVERNMENTS, *et al.* )
)
    Defendants. )

## AFFIDAVIT OF CALVIN SMITH

I, Calvin Smith, being duly sworn, make the following statements which to the best of my knowledge are true and accurate and to which I have personal knowledge and I am competent to testify to:

1.    I am the Director of Human Services, Planning and Public Safety for Metropolitan Washington Council of Governments (MWCOG), and I have held that position throughout the time Madison Collins, Jr. worked for MWCOG.

2.    Plaintiff, Madison Collins, Jr., was hired as a permanent employee of MWCOG in July, 2004, after having worked as a temporary employee starting in December, 2003.  Mr. Collins' job title was Administrative Assistant II, and he reported directly to me.  I made the decision to hire Mr. Collins as a permanent employee of MWCOG.  I initially had Mr. Collins report to me, and then later, I had him report to Nancy Rea, who in turn reported to me. However, at all times I was in charge of making decisions as to Mr. Collins' discipline and to whether his employment with MWCOG should continue.

3.    I made the decision that Mr. Collins' employment with MWCOG needed to end, and I have him two months to look for employment elsewhere.  This was based on my own interaction with Mr. Collins and my discussions with him.  While I did obtain input from Nancy Rea, her comments were no different then my personal observations and interaction with Mr.

DC1 30209436 1 / 54509.000002

Collins. Ms. Rea's input was not in any way determinative in deciding that Mr. Collins employment with MWCOG needed to end, but rather the decision was made based on my own observations of Mr. Collins and my discussions with Mr. Collins. In short, I hired Mr. Collins, and I made the decision that his employment with MWCOG had to end. I gavem Mr. Collins two months to look for other employment, and at the end of the two months he resigned his employment with MWCOG in June, 2006.

4.    Mr. Collins in his charge to the EEOC, which is Exhibit 1 attached hereto, stated that it was I who "requested that he train his replacement, informing him that he would be terminated effective mid-June 2006." While Mr. Collins is correct that I alone made the decision that Mr. Collins' employment with MWCOG had to end, what I said was we needed to go in a different direction, and I gave him two months to seek employment elsewhere. Mr. Collins understood that at the end of the two months he would either have to resign his employment with MWCOG or he would be fired.

5.    I selected the replacement for Mr. Collins - Joey Price. Mr. Price took over Mr. Collins' position when Mr. Collins left MWCOG in June, 2006. Mr. Price continued with MWCOG in the position Mr. Collins held until November, 2006. Mr. Price left because he was attending college, and he left on good terms.

6.    Mr. Collins is an African-American male.

7.    I am an African-American male.

8.    Joey Price is an African-American male.

9.    Marie Ricasa is a female, she is petite even for a female, and under 5 feet tall; whereas Mr. Collins is approximately 6 feet tall, and he has said he is athletic and that he engages in many sports.

10.    Ms. Ricasa was never the Mr. Collins' supervisor, she was only his co-worker.

2

11.    Mr. Collins in his Complaint filed in this case on March 15, 2007, admitted that during his first year of employment with MWCOG, "Ricasa and I gained a mutual working respect and friendly working relationship. Ms. Ricasa would offer to buy me lunch or share breakfast with me almost daily."    It is true that Ms. Ricasa was cordial towards Mr Collins and they did not have problems working together when Mr. Collins initially begin working for MWCOG.

12.    While not required to do so, and not at all the norm,  MWCOG gave Mr. Collins a salary advance of $3,000 in July, 2005 when he claimed a family emergency as reflected in Exhibit 3 attached hereto.

13.    Ms. Ricasa on October 13, 2005 made a complaint to  MWCOG claiming that Mr. Collins sexually harassed her as described in Exhibit 4 attached hereto.  On October 17, 2005 MWCOG gave Mr. Collins a written disciplinary warning based on Mr. Collins' conduct as described in Exhibit 5 attached hereto.

14.    Mr. Collins had performance problems while working for me, both directly and indirectly, through Nancy Rea.  Exhibit 6 attached hereto reflects the performance problems during Mr. Collins' last nine months working at  MWCOG.  While Nancy Rea was Mr. Collins' direct supervisor during this time period, my own experience with Mr. Collins during this time period confirmed Ms. Rea's complaints about Mr. Collins. Thus, Ms. Rea's comments were not at all determinative, but rather I relied upon my own observations and interaction with Mr. Collins to make the decision that Mr. Collins' employment with MWCOG needed to end. Indeed, Ms. Rea's complaints as to Mr. Collins were the same kind of problems I experienced when he reported directly to me.

15.    Mr. Collins alleges Ms. Ricasa  assaulted him on January 20, 2006. Ms. Ricasa denied the assault occurred and sent a denial memorandum to MWCOG, exhibit 7 attached hereto.  MWCOG could find no evidence that Ms. Ricasa assaulted Mr. Collins, other than Mr.

3

Collins' claim. Exhibit 8 attached hereto is a memorandum MWCOG gave Mr. Collins on January 26, 2006, reflecting MWCOG's response to Mr. Collin's claim that Ms. Ricasa assaulted him. The only witness Mr. Collins identified to the alleged assault was Owais Rafique, but Mr. Rafique denied to the investigator that he witnessed anything.

16.    Mr. Collins presented no evidence that Ms. Ricasa intentionally closed a door on his hand. Even if she did close the door on Mr. Collins' hand, there was no evidence the door closing on his hand was anything other than an accident.

17.    Exhibits 3 through 8 are true and accurate copies of business records kept in the ordinary course of business.

Calvin Smith

The forgoing has been signed and sworn to before me this _18th_ day of _October_, 2007.

_Jess C. Dillon_
Notary Public

My Commission expires: _March 14, 2008_

4

DC1 30200426 1 / 54500 000003

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 570-2006-01302 |

| | | |
|---|---|---|
| WASHINGTON Office Of Human Rights | | and EEOC |

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Mr. Madison Collins, Jr. | (301) 559-8243 | 05-14-1965 |

| Street Address | City, State and ZIP Code |
|---|---|
| 5459 16th Ave, #101, Hyattsville, MD 20782 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| METROP. WASHINGTON COUNCIL OF GOVT | 15 - 100 | (202) 962-3200 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 777 N. Capitol St Ne,  Suite 300,  Washington, DC 20002 | | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| ☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | 06-01-2006 | 06-16-2006 |
| ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)* | ☐ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began working for Respondent in December 2003 as an Administrative Temp.  I became a permanent employee around July 2004. On January 20, 2006, during a meeting in COG's board room Administrative Assistant Marie Ricasa (Asian) pushed the rear board room lounge door on to my hand, hitting my hand causing it to be cut, bruised and swollen then proceeded to push the door closed on me crushing my hand and body with me in the door way until the door was closed.  I immediately reported the incident to Health Chief Nancy Rea (White) and HSPPS Director Calvin Smith (Black) were attending the meeting. Human Resource Director Imelda Roberts (Asian) Director Smith, Human Resource Representative Janet Ernst (Asian) and Ms. Robert interrogated me about this incident in a manner that suggested they questioned my credibility. To my knowledge, no corrective action was taken. In early June 2006. Director Smith requested that I train my replacement, informing me that I would be terminated effective mid-June 2006.

I believe that I have been discriminated against based on my race (Black) and my gender (male) in violation of Title VII of the Civil Rights Act of 1964, as amended

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Aug 02, 2006          *Charging Party Signature*<br>Date | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

Exhibit 1

EEOC Form 161 (3/98)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Madison Collins, Jr.<br>7157 Marbury Ct.<br>District Heights, MD 20747 | From: | Washington Field Office - 570<br>1801 L Street, N.W.<br>Suite 100<br>Washington, DC 20507 |
|---|---|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **570-2006-01302** | **Janet Stump,**<br>**Enforcement Supervisor** | **(202) 419-0700** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
| ☐ | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| ☐ | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| ☐ | While reasonable efforts were made to locate you, we were not able to do so. |
| ☐ | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| ☒ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Janet A. Stump for*

**Dana Hutter,**
**Director**

Enclosures(s)

**NOV 16 2006**

(Date Mailed)

cc:      Imelda Roberts
         Human Resources Director
         METROPOLITAN WASHINGTON COUNCIL OF
         GOVERNMENT
         777 N. Capitol Street, NE
         Suite 300
         Washington, DC 20002

Exhibit 2

7/13/2005

Ms. Imelda Roberts
Director Human Resources
COG

Dear Imelda:

I am writing this note to you to request a small advance for a family emergency.  Imelda, I am currently going through some marriage issues that are irresolvable at this time. I have two children who are at the heart of this sad situation who need to have a new home.  Since my separation, my wife has been living with her mother and now they have to move because of her mother's lease.  I have been struggling since the separation financially to make ends meet with having to pay for child support and daycare and to just live and work so I can take care of my responsibilities.   I recently had two deaths in the family that exhausted the small savings I had, because of the travel cost to attend the funeral.  I know this is not normal procedure for COG to assist in this way, but I don't have anyone else to turn to right now.  I am requesting, if possible a $3,000 advance that I will pay back over 8 months @ $375 per month or $187.50 per pay period.

I thank you in advance for any assistance you can grant.

Sincerely,

Madison Collins Jr.

$2000 - Approved

Exhibit 3

Date:   October 17, 2005

To:    Ms. Imelda Roberts

Thru:  Mr. Calvin Smith

From:  Marie Ricasa

Last Thursday, October 13, Mr. Calvin Smith, HSPPS Director, met with me and my 2 co-workers, Ms. Rene Farrish and Mr. Madison Collins.

Previous to this I spoke with Mr. Smith about improper behavior of my co-worker, Mr. Madison Collins, and concerns about my safety.

<u>Why this meeting was called</u>
A few weeks ago I was asked by Ms. Bempong to take care of registration for the October 28 training. I was also tasked to do other things related to this training. She mentioned that Mr. Collins will do the rest.

Mr. Collins then informed me that he will take over the task in the future, and requested that I explain and walk him through the process, particularly the training workbook. While I was showing him the workbook, he leaned towards the computer screen. I felt uncomfortable but I continued. When he put his left hand over my shoulder and his head closer I told him "don't do that", and reminded him that in the past I told him I feel uncomfortable when he does that. And he did.

(There were incidents in the past where he would come and put his hands on my desk, enclosing me in the process, and told him to take it off. I didn't go to my supervisor because I made it clear to him that this is not proper behavior.)

After that I tried to minimize contact with him; however, he either called or came to me to talk about the same thing over and over (i.e., catering), so I finally told him I need not know and this is his ballgame.

He then approached me about other things like certificates (letter from NASW, hours to put) and about registering people who left messages on his voicemail. I told him he could register these people himself as practice. He insisted that I walk him through the process again and I refused as I do not want a repeat of the same incident. He did not take this lightly and warned that he will tell the project manager (Ms. Nancy Rea) that I refused to help him.

The following day, around mid-afternoon, when I was doing my work quietly facing towards the window, he suddenly came, put his hands on my shoulders and his head beside me with his mouth on my ears and said "You love me, don't you." I then reacted by telling him "Don't touch me! and do not ever touch me again! I told him it is improper behavior and if he does it again I will charge him with harassment. He laughed and said it was a joke and besides: "Who will

- 1/2 -

believe you, no one saw me do it." This statement scared me because it is true—no one was in my area at that time—and it clearly shows he will not stop doing it. It was very disturbing.

After that, he would find more excuses to approach me but I made it a point to get out of my work space. Before a meeting with Ms. Rea last week, he made some work-related accusations, undermining my work, and I realized it is his way of making me work closely with him again. Since I am feeling more uncomfortable and it is clear that his misbehavior is escalating, I told him in an angry manner, after the meeting, not to touch me again.

That day, Wednesday (October 12), I finally told our director, Mr. Calvin Smith, about the incident and expressed concern about my safety because of what he told me about an altercation with a staff in transportation and other stories in the past.

The following day, Thursday (October 13), Mr. Smith met with Mr. Collins, Ms. Farrish, and me and told us to respect each others work space, and made it clear that Mr. Collins should not go into my work space (as I requested). I also requested that I be relieved of work related to the October 28 training to avoid further contact with Mr. Collins, and Mr. Smith consented.

The following day, Friday (October 14), around lunch time while I was proofreading a document for Mr. McMillion, I was startled seeing him suddenly right beside me in my work space. I reminded him that he was told not to do that and he just made faces and left. I realized that (as in past incidents) no one was in my immediate area and he took this opportunity to do what he did. I immediately went to Ms. Rea (Mr. Steve Dickstein was in her office at that time) and reported the incident and Ms. Rea went to Mr. Collins' work area. I followed but kept my distance, and again told Ms. Rea he should be stopped. At this point he told me to "take a pill".

Apparently, he did not take the meeting with Mr. Smith seriously, and blatantly showed complete disregard for Mr. Smith's instructions and that he can do as he pleases, particularly when no one is around. This made me more concerned about my safety.

Ms. Rae and Mr. Dickstein went to Personnel (Ms. Ernst's office) and I followed them, and I narrated the incident to Ms. Ernst. We met again with Mr. Smith around mid-afternoon.

This memo is to put on record my concern about my safety and request that something be done about Mr. Collins' improper behavior.



# METROPOLITAN WASHINGTON ⬤ COUNCIL OF GOVERNMENTS

*Local governments working together for a better metropolitan region*

District of Columbia
Bowie
College Park
Frederick County
Gaithersburg
Greenbelt
Montgomery County
Prince George's County
Rockville
Takoma Park
Alexandria
Arlington County
Fairfax
Fairfax County
Falls Church
Loudoun County
Manassas
Manassas Park
Prince William County

October 14, 2005

TO: Madison Collins
FROM: OHRM
RE: Disciplinary Warning
CC: Calvin Smith, Steve Dickstein, Nancy Rea

It has come to our attention that on October 13th 2005, Calvin Smith, held a meeting with Marie Ricasa, Renee Farrish and yourself to discuss alleged complaints regarding your inappropriate behavior towards Marie Ricasa and Renee Farrish. During this discussion, Calvin Smith, Director of HSPPS, clearly stated that it was inappropriate and unprofessional to make unwelcome physical contact with your female co-workers and that this behavior must cease immediately. You were further warned to stay out of Marie Ricasa's work area and to not engage in any verbal or physical contact with her unless it was work related. Today, we received another report that you went into Marie's Ricasa's work space and antagonized her.

In COG's administrative and Human Resources Manual, Section 6-1 A, our policy clearly states:

Harassment
A. Statement of Policy

*COG expressly prohibits any harassment of any COG employee based on race, color, religion, sexual preference, national origin, age, disability, status as a Vietnam-era or special disabled veteran, or status in any group protected by state or local law. Harassment is a form of discrimination under Title VII of the Civil Rights Act of 1964 and the D.C. Human Rights Act. All managers and supervisors have been instructed to report to the Director, Office of Human*



*Resources Management as soon as they have become aware of any conduct that may constitute harassment, including sexual harassment as defined in Section B below. Any employee of COG found in violation of these rules and policies shall be subject to appropriate disciplinary action, up to and including termination.*

B. <u>Sexual Harassment</u>

    *1. The Metropolitan Washington Council of Governments (COG) will neither accept nor condone any conduct or behavior which constitutes sexual harassment in the workplace. All managers and supervisors have been advised of their responsibilities to assure that the COG workplace is free of any such attitudes and behaviors. Any employee of COG found in violation of these rules and policies shall be subject to appropriate disciplinary action, up to and including termination.*

    *2. Definitions*
    *Sexual harassment is discrimination under title VII of the Civil Rights Act of 1964. The Equal Opportunity Commission defines sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:*

    *a. Submission to such conduct is made either implicitly or explicitly a term or condition of an individual's employment;*
    *b. Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting the individual; or*
    *c. Such conduct has the purpose or effect of reasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment."*

This memo is formal notice that we are conducting an internal harassment investigation into actions that you inappropriately touched Marie Ricasa. When a complaint of this nature is brought to OHRM, it is our duty to confidentially investigate all sides of the allegations and to obtain a written statement from both the employee filing the claim and the employee who the claims are being brought against. Witness statements will also be collected when applicable and a final determination will be made after all facts are gathered and analyzed.

Please refer to Section 6-2, Complaint Procedure, in COG's Administrative and Human Resources Manual for further details regarding this process.

This memo acknowledges receipt that I have been formally informed that a harassment complaint has been brought against me and that I will be asked to provide written documentation regarding my actions.  I further understand that by signing this memo, I am only acknowledging that I received this notification and that a final determination will be presented to me after all the facts of this case has been collected and reviewed by appropriate management staff.

_____     10/18/05
Employee Acknowledgement            Date

_____     10/21
Director's Signature                Date

_____     10/18/05
OHRM Representative                 Date

Summary of Madison Collins' Work Issues, September 2005 through June 2006
By
Nancy Rea, Chief, Health and substance Abuse Section

During the 9 months that Madison Collins reported to me as part of the health team, there was a constant, on-going history of resistance to supervision. He wanted to spend his time on the tasks he preferred, rather than the tasks that were of the highest priority, and put forth many reasons for not being productive.

One task that was to be a major responsibility was keeping the outlook distribution lists and contact lists updated. He was to up-date the lists from sign in sheets and from email bounces, as well as adding new contacts from business cards. He used multiple strategies to avoid doing this task, complaining that it was too time consuming. The temporary administrative assistant who was brought in at the end of Madison's employment completed the initial update in less than one day, and provided updates after each meeting or mailing within one day.

In the early weeks of his assignment, Madison was frequently away from his desk without justification. He had responsibility for relieving the receptionist at certain times. The receptionist complained to me, both directly and through Carl Kalish, that Madison did not show up on time to cover the reception desk. Dave McMillion complained that Madison was late for setting up a large UASI function. I coached Madison on being where he was supposed to be when he was supposed to be. Although he eventually complied somewhat with the request to be at his desk, he expressed resentment, and continued to be late arriving frequently. In one month that I recorded, he was late at least one day per week. He tended to phone in about 20-30 minutes after he should have been here to say he was running late. At the last meeting in May, he said he wasn't responsible for being late because the bus was frequently late. However, his excuses were varied, including, in addition to the late bus, a broken garbage disposal, a broken lock on his door, various emergencies or duties with his children, and various ailments. I expressed concern over both the pattern of frequency and the lack of notification. In our couching sessions I suggested that if he was not on the bus at the normal time he knew he would be late and should call,

He complained that he had trouble concentrating because his desk was in a cubicle near the copier and printer. I suggested he use headphone with music to block out distractions. In April I arranged for him to move to one of the desks in the new intern office, which might offer fewer distractions. Although he listed more than 6 hours on his time management log as "preparation to move" no progress was visible at the time he left.

One of the first tasks I assigned him was to figure out how long it took him to do certain specific tasks that repeat from time to time, so I could allocate an appropriate amount of work to him. He never was willing to work with me to provide these estimates and even at the final meeting in May, said that focusing on time for tasks was a waste of time. Unable to get his cooperation in a less formal way, in March I began requiring him to provide a daily log, based on the Franklin/Covey time management approach, with a prioritized list of tasks to be done each day followed up with a record of how much time was spend on each task. I presented this to him as a tool to document his productivity as a step towards increased compensation at his next performance review. As part of this process I asked him to provide a self-rating each day based on the COG performance review scale. He clearly resented this documentation. In the early weeks he rated himself in the 2-6 range on most scores most days. However, after I showed him how his ratings would play out in computing a merit increase in pay, he began to rate himself a 9 on all items. He did not turn in a self-rating on all days, and I noted that he tended to avoid rating himself on

Exhibit 6

days when his productivity was low. The daily log sheets were done for 6 weeks until the April 28, 2006 when an incident brought things to a crisis point.

In November our coaching sessions began to include how to avoid harassment charges and conflict avoidance and resolution.

Near the end of January I summarized, in a note to myself, the progress he had made and the challenges still ahead of him. I noted that

> he has improved his job performance and is cooperating with staff to increase his productivity. Progress has been made in addressing both performance and attitudes. He and I have had many discussions on planning for improved productivity, and he has followed up with development of systematic approaches to some tasks. The areas he does best in fall into two categories:
> - Meeting support in logistics such as setting up meeting rooms, making copies, ordering supplies and ordering food service
> - Customer service and in following up to requests for services and/or information.
>
> However, after five months of being coached on improving his job performance, he should be ready to work on this with less supervision and to take increased responsibility for planning and implementing improvement of his job performance and attitudes before the end of this fiscal year and his next performance review. The areas needing improvement fall into the following categories:
> - Punctuality in attendance
> - Time management skills
> - Limiting socializing
> - Meeting assignment deadlines
>
> I asked him to develop a work plan with goals and outcome measures for us to review and agree upon. As always, will be here to assist him, but am now going to step back and let him take the lead in managing your professional growth to meet expectations.

He was unable to produce the requested work plan, but did begin to discuss with me each day which tasks he should focus on.

On Friday, February 17, 2006, just as a Public Safety Policy Committee meeting was beginning, Madison came to me to say that he had been in the Boardroom lounge to get ice as part of setting up another meeting. Marie Ricasa was in the lounge setting up lunch for the PSPC. She would not allow him to take a cookie, and when he left by the back door she pushed the door closed against him and his hand was injured. Because I had previously told him to avoid being alone with Marie, I asked if anyone else has seen what happened. He said Owais Raffique was just entering the room at the time. I instructed him to report the incident to HR and asked him to send me an email describing the incident. I explained that I would be out of the office Monday, but would ask Calvin to talk to him. Later he came to me and said he was leaving to go to the doctor to have his hand and arm x-rayed. A few minutes later I spoke with Owais who said he had not seen anything. Later Madison would tell me that Marie smiled at someone else and offered a cookie to that person. However other than Owais he gave me no name on anyone who had been in the room.

Madison did not get his hand x-rayed until Monday. I heard reports that he played tennis over the weekend. After he had it x-rayed he said that it was "bruised." He mentioned the pain for a few days, but stopped complaining about it after that and did not indicate that it was causing any problem. Madison frequently spoke of physical problems such as indigestion, sore muscles, tooth aches, etc. In April or May he discussed with me his need for a primary care physician. After I gave him a suggestion on how to search the list of participating physicians, he made an appointment and had a physical. He told me afterward about the results of the physical, mentioning some other problems that had been identified, but said nothing about the injury to his hand. During this time period he continued to complain about how Marie had "assaulted" him, but did not mention any continuing pain. He occasionally spoke of the incident in February up until the time he left; however his remarks were confined to his concerns about people's actions and beliefs rather than any complaints of continuing pain. I frequently reminded him that the incident was an example of how difficult it is to prove what happens between two people when there are no other witnesses, and the need to protect himself from both victimization and false accusations.

On April 28, 2006 Madison was an hour late in arriving to set up for a special event. Among the tasks he was responsible for that morning were receiving the breakfast delivery from the caterer, , and getting the room unlocked for the presenters and sound system set up, which were all scheduled for 7:00 AM. Based on his past record, I decided to arrive early also. When he arrived later, and I objected to his being late, he became belligerent and started shouting at me in the public hallway outside the room as event organizers were doing the set up. He later was also loudly belligerent to Beth Nelson. At that point I decided to stop the coaching and put him on notice in writing that his behavior was unacceptable and could lead to termination. He refused to "read or sign anything." (see memo of April 28) When Madison refused to accept the memo I asked Calvin to either reassign him or begin the process for termination.

I understand that Calvin met with him and they reached an agreement. On May 1, 2006, Calvin, Madison and I met. Madison apologized for his unprofessional conduct. He said he really wanted to work at COG. Calvin stated that we were going to move beyond the incident and have a good month during which Madison "will do his job." And that during that month Madison would be looking for a new positions with Calvin's help.

At the end of May, a temporary assistant was hired and Calvin gave Madison additional time to find a new job prior to submitting a resignation. During the last two weeks prior to his resignation he was not in the office except on one occasion when he came in for a short time, wearing shorts and a tee shirt, on a day when he had said he had a job interview.

## HSPPS INTEROFFICE MEMORANDUM

**TO:**      MR. DAVID ROBERTSON, MR. CALVIN SMITH, MS. IMELDA ROBERTS, MS. JANET ERNST

**FROM:**     MARIE RICASA

**SUBJECT:** ALLEGATIONS MADE BY MR. MADISON COLLINS

**DATE:**     JANUARY 23, 2006

My department director, Mr. Calvin Smith, and Ms. Janet Ernst of Human Resources spoke to me this morning about allegations made by Mr. Madison Collins. They showed me an e-mail sent by Mr. Collins last Friday to Mr. David Robertson, Ms. Imelda Roberts, Ms. Janet Ernst, and Ms. Larissa Williams.

I was shocked when I read the first paragraph e-mail and the first thing that came to mind was: this is another act of intimidation and retaliation to the complaint I filed with Personnel in October 2005 about his inappropriate behavior, and as a result of which he was given disciplinary warning and apologized through Ms. Nancy Rea.

May I state for the record that since I filed the complaint and in spite of his apology, I have been concerned for my safety (always looking over my shoulders when someone is behind me), at the same time trying to remain calm so I can function and do my job. It has been very stressful because of our respective work areas being in close proximity. Hence, this latest act on his part is very disturbing and unnerving.

About the complaint: Mr. Collins alleged that I closed the door of the Board Room lounge at him last Friday, January 20, after he got some ice from the ice machine and a cookie from the food table, thereby injuring him.

What happened last Friday, January 20, 2006:

I was at the Board Room lounge at around 11:30AM to make coffee and take care of the catering for the Public Safety Policy Committee Meeting (PSPC), backing-up my co-worker, Ms. Renee Farrish. I sat there for a while as there was a meeting going on before the start of the PSPC meeting, and we didn't want the participants of that meeting to think that the catering was for them. As I sat, reading a newspaper, Mr. Collins entered the room and took some ice from the machine, after which he went to survey the food at the table and then started picking up cookie after cookie to look at them. Even though I am always concerned for my safety when he is around, I remained calm (thinking there were a lot of people in the Board Room) and continued reading the newspaper. While Mr. Collins was still at the food table, Mr. Owais Raffique came in from the Board Room, followed by another person, so I stood up and told Mr. Raffique to help himself and get some lunch (since he was assisting us with the presentation for the meeting).


Exhibit 7

After a short while, some people (I didn't recognize) started going out via the lounge. When people came in and out of the lounge, once in a while I stood up and made sure the door was locked (quietly to avoid disruption), since in the past we have had incidents when people not involved in the meeting helped themselves with the food even before the participants. I don't remember when Mr. Collins left the lounge, nor closing the door when he left. I did not, as he alleged in his complaint, shut the door so hard so as to injure him, nor hear him say the things he stated in his e-mail. (An incident like he stated in his e-mail would have created a big commotion in the lounge and disrupted the proceedings at the Board Room.) When the previous meeting was over and more PSPC attendees started coming in the lounge, I left and returned to my work area. Later, on my way to the ladies room, I saw Mr. Collins coming in with a plateful of food. I took another way to the ladies room.

I want to put on record that from the time I filed my complaint, I have avoided any confrontation with Mr. Collins even as he made faces at me and mocked me when he sees me alone in the corridor or chance upon opening the door.

Throughout this ordeal, I have tried my best to remain calm, professional, and maintained proper office decorum. I take pride in the work I do and have done my work to the best of my ability, under extremely stressful condition.

Mr. Collins' latest act/accusation has intimated me so much that I am now more concerned not only for my safety, but for my life. Since this was brought to my attention, I have felt very disturbed, nervous and scared. I could not do my work, I could not concentrate, thinking what he would do next. I am afraid that his making false accusations will escalate to something more. This complaint was purely an act to intimidate and retaliate because of the complaint I filed.

I am therefore requesting Management to do something about the situation, so I can report to the office without fearing for my safety and my life. Last October, I have requested that I be relieved of any work that requires communication or interaction with Mr. Collins. However, since that time I have found Mr. Collins in some of the meetings I have assisted preparation for (example, public safety, PDCP, HSPC, PSPC). I am reiterating that request and further requesting a change in location of our work areas, since I have been working under extremely stressful environment since the time I filed my complaint because of the close proximity of our work areas.

TO: Madison Collins

FROM: Calvin Smith

RE: Incident on January 20, 2006

CC: OHRM, Dave Robertson, Lee Ruck

After a detailed investigation regarding your alleged complaint that Ms. Ricasa assaulted you in the boardroom lounge on January 30th, 2006; we have found that there are no witnesses that can either corroborate either your version of events or Ms. Ricasa's version of events. Due to the lack of corroborating evidence and lack of witnesses to this event, we are unable to make an affirmative determination of your complaint. We are aware that you injured your hand (how it was done, is unsubstantiated) and we did advise you of your rights to file a claim with Workman's Compensation. In fact, OHRM gave you the incident report three times, and you finally turned the form to OHRM on February 7, 2006. Your workman's compensation claim number for this injury has been filed and is YKYC1580. We also filed your emergency hospital room bills on your behalf to our Workman's Compensation Carrier.

With regard to your professional relationship with Ms. Ricasa, it has become clear to both myself and the staff of Human Resources who have spoken to you about this matter that there are personality and personal differences between the two of you that is causing an interruption between the normal work activities of the department. Because this situation is becoming more intolerable for both you and Ms. Ricasa, I am recommending that OHRM assist me with identifying training/and or EAP sessions that will assist you both with providing coping strategies with dealing with interpersonal relationships between the two of you including an anger management seminar. Please contact Janet Ernst to work with her in identifying appropriate resources to help you with your issues.

Finally, I also would like to emphasize former agreements made to keep both of your apart as much as possible and to avoid any interaction with each other until both of you have resolved any issues you may have against each other. Any work or communications that need to be handled between the two of you should go through your supervisor, Nancy Rea.

If you have any questions, please feel free to contact me.

Exhibit 8

June 23, 2006

Calvin L. Smith
Director, HSPPS
Metropolitan Washington Council of Governments
777 North Capitol St.
Washington, DC 20002

Dear Calvin:

It is with great sorrow that I am hereby tendering my resignation to you. _Effective June 30th_

Although there is much to say, I believe the reasons leading to this decision are known by you, and I will therefore leave them unsaid at this time.

I appreciate having had the opportunity of being a member of the HSPPS department which you lead honorably for the 2 year period I worked for you.  I offer my best wishes for your continued success.

Regretfully,

Madison Collins Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MADISON COLLINS, JR.,                    )
                                         )
          Plaintiff,                     )
                                         )          Civil Action No. 07-497 (HHK)
     v.                                  )
                                         )
METROPOLITAN WASHINGTON                  )
COUNCIL OF GOVERNMENTS, *et al.*         )
                                         )
          Defendants.                    )

## AFFIDAVIT OF MARIE RICASA

I, Marie Ricasa, being duly sworn, make the following statements which to the best of my

knowledge are true and accurate and to which I have personal knowledge and I am competent to

testify to:

1.     I am an Administrative Assistant for the Human Services, Planning, and Public

Safety Department (HSPPS) of the Metropolitan Washington Council of Governments

(MWCOG), and I have held that position throughout the time Madison Collins, Jr. worked for

MWCOG.

2.     I was never Mr. Collins' supervisor, I was only his co-worker.

3.     Mr. Collins in his Complaint filed in this case on March 15, 2007, admitted that

during his first year of employment with MWCOG, "Ricasa and I gained a mutual working

respect and friendly working relationship. Ms. Ricasa would offer to buy me lunch or share

breakfast with me almost daily." It is true that I was cordial towards Mr. Collins and we did not

have problems working together when he initially begin working for MWCOG.

4.    On October 13, 2005, I made a complaint to MWCOG stating that Mr. Collins had repeatedly engaged in improper behavior as described in Exhibit 4 attached hereto. The statements in Exhibit 4 are true and accurate.

5.    Mr. Collins alleges I assaulted him on January 20, 2006. I did not assault Mr. Collins in any way shape or form. I did not close a door on his hand as he alleges.

_____
Marie Ricasa

The foregoing has been signed and sworn to before me this _16th_ day of _October_, 2007.

_Jess C. Dillon_
Notary Public

My Commission expires: _March 14, 2008_

2

Date:  October 17, 2005

Rcvd in OHRM 10/20/2005 at 2:30 pm

To:    Ms. Imelda Roberts

Thru:  Mr. Calvin Smith

From:  Marie Ricasa

Last Thursday, October 13, Mr. Calvin Smith, HSPPS Director, met with me and my 2 co-workers, Ms. Rene Farrish and Mr. Madison Collins.

Previous to this I spoke with Mr. Smith about improper behavior of my co-worker, Mr. Madison Collins, and concerns about my safety.

<u>Why this meeting was called</u>
A few weeks ago I was asked by Ms. Bempong to take care of registration for the October 28 training. I was also tasked to do other things related to this training. She mentioned that Mr. Collins will do the rest.

Mr. Collins then informed me that he will take over the task in the future, and requested that I explain and walk him through the process, particularly the training workbook. While I was showing him the workbook, he leaned towards the computer screen. I felt uncomfortable but I continued. When he put his left hand over my shoulder and his head closer I told him "don't do that", and reminded him that in the past I told him I feel uncomfortable when he does that. And he did.

(There were incidents in the past where he would come and put his hands on my desk, enclosing me in the process, and told him to take it off. I didn't go to my supervisor because I made it clear to him that this is not proper behavior.)

After that I tried to minimize contact with him; however, he either called or came to me to talk about the same thing over and over (i.e., catering), so I finally told him I need not know and this is his ballgame.

He then approached me about other things like certificates (letter from NASW, hours to put) and about registering people who left messages on his voicemail. I told him he could register these people himself as practice. He insisted that I walk him through the process again and I refused as I do not want a repeat of the same incident. He did not take this lightly and warned that he will tell the project manager (Ms. Nancy Rea) that I refused to help him.

The following day, around mid-afternoon, when I was doing my work quietly facing towards the window, he suddenly came, put his hands on my shoulders and his head beside me with his mouth on my ears and said "You love me, don't you." I then reacted by telling him "Don't touch me! and do not ever touch me again! I told him it is improper behavior and if he does it again I will charge him with harassment. He laughed and said it was a joke and besides: "Who will

- 1/2 -


Exhibit 4

believe you, no one saw me do it." This statement scared me because it is true—no one was in my area at that time—and it clearly shows he will not stop doing it. It was very disturbing.

After that, he would find more excuses to approach me but I made it a point to get out of my work space. Before a meeting with Ms. Rea last week, he made some work-related accusations, undermining my work, and I realized it is his way of making me work closely with him again. Since I am feeling more uncomfortable and it is clear that his misbehavior is escalating, I told him in an angry manner, after the meeting, not to touch me again.

That day, Wednesday (October 12), I finally told our director, Mr. Calvin Smith, about the incident and expressed concern about my safety because of what he told me about an altercation with a staff in transportation and other stories in the past.

The following day, Thursday (October 13), Mr. Smith met with Mr. Collins, Ms. Farrish, and me and told us to respect each others work space, and made it clear that Mr. Collins should not go into my work space (as I requested). I also requested that I be relieved of work related to the October 28 training to avoid further contact with Mr. Collins, and Mr. Smith consented.

The following day, Friday (October 14), around lunch time while I was proofreading a document for Mr. McMillion, I was startled seeing him suddenly right beside me in my work space. I reminded him that he was told not to do that and he just made faces and left. I realized that (as in past incidents) no one was in my immediate area and he took this opportunity to do what he did. I immediately went to Ms. Rea (Mr. Steve Dickstein was in her office at that time) and reported the incident and Ms. Rea went to Mr. Collins' work area. I followed but kept my distance, and again told Ms. Rea he should be stopped. At this point he told me to "take a pill".

Apparently, he did not take the meeting with Mr. Smith seriously, and blatantly showed complete disregard for Mr. Smith's instructions and that he can do as he pleases, particularly when no one is around. This made me more concerned about my safety.

Ms. Rae and Mr. Dickstein went to Personnel (Ms. Ernst's office) and I followed them, and I narrated the incident to Ms. Ernst. We met again with Mr. Smith around mid-afternoon.

This memo is to put on record my concern about my safety and request that something be done about Mr. Collins' improper behavior.