IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MADISON COLLINS, JR.,                    )
                                         )
        Plaintiff,                       )
                                         )        Civil Action No.  07-497 (ESH)
    v.                                   )
                                         )
METROPOLITAN WASHINGTON                  )
COUNCIL OF GOVERNMENTS, *et al.*         )
                                         )
        Defendants.                      )

### DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, the Metropolitan Washington Council of Governments ("MWCOG") and

Marie Ricasa ("Ricasa"), by their undersigned counsel and pursuant to Federal Rule of Civil

Procedure 56 and Local Rule 56, respectfully submit this memorandum of points and authorities

in support of their motion for summary judgment.

### STATEMENT OF FACTS

Plaintiff initiated this action on March 15, 2007 by filing a rambling nine (9) page

Complaint in this Court, with no numbered paragraphs.  On August 17, 2007 the Plaintiff filed a

(17) page Amended Complaint, with numbered paragraphs, but the Amended Complaint is still

rambling and lacks focus.  Nevertheless, it is clear that this is an employment discrimination

action wherein the Plaintiff alleges that he was discriminated against because of his race – black

(African-American)  and gender – male,  in violation of Title VII of the Civil Rights Act of 1964,

42 U.S.C. §2000e *et seq.* amended complaint.  The Plaintiff also alleges an assault by a co-

worker, Defendant Ricasa, claiming she closed a door on his hand.

The relevant facts, as stated in Defendants' Statement of Material Facts Not In Dispute, are as follows (Exhibits are attached to the Statement of Material Facts Not in Dispute). In addition, the affidavits of Calvin Smith and Defendant Ricasa attached to the motion for summary judgment establish these facts:

1.    The Plaintiff's claim in this lawsuit is that Defendant MWCOG discriminated against him based on his race – African American (black) and his gender – male, and that Defendant Ricasa assaulted him on January 20, 2006 by closing a door on his hand.  Exhibit 1 is the Plaintiff's EEOC charge upon which this lawsuit was filed.

2.    Plaintiff, Madison Collins, Jr., was hired as a permanent employee of MWCOG in July, 2004, after having worked as a temporary employee starting in December, 2003.  Mr. Collins' job title was Administrative Assistant II, and he reported directly to Calvin Smith, who is the Director of Human Services, Planning and Public Safety for Defendant MWCOG.  Mr. Smith made the decision to hire Mr. Collins as a permanent employee of Defendant MWCOG. Mr. Smith initially had Plaintiff report directly to Mr. Smith, and then later, Mr. Smith had the Plaintiff report to Nancy Rea, who in turn reported to Mr. Smith.  However, at all times Mr. Smith was in charge of making decisions as to Plaintiff's discipline and whether Plaintiff's employment with Defendant MWCOG should continue.

3.    Defendant MWCOG's decision to hire Plaintiff was made by Calvin Smith.

4.    Defendant MWCOG's decision that Plaintiff's employment with Defendant MWCOG needed to end and that he had to seek employment elsewhere was made by Calvin Smith.

5.    Plaintiff in his charge to the EEOC, which is Exhibit 1 attached hereto, stated that it was Calvin Smith who "requested that I train my replacement, informing me that I would be

2

terminated effective mid-June 2006." Mr. Smith told the Plaintiff that they needed to go in a different direction, and Mr. Smith gave Plaintiff two months to seek employment elsewhere. Plaintiff understood that at the end of the two months he would either have to resign his employment with Defendant MWCOG, which he ultimately did, or he would be fired. Mr. Smith alone made the decision to terminate Plaintiff's employment with Defendant MWCOG.

6.      Mr. Smith selected the replacement for the Plaintiff - Joey Price. Mr. Price took over Plaintiff's position when Plaintiff left Defendant MWCOG in June, 2006. Mr. Price continued with Defendant MWCOG in the position Plaintiff held until November, 2006. Mr. Price left because he was attending college, and he left on good terms.

7.      Plaintiff is an African-American male.

8.      Calvin Smith is an African-American male.

9.      Joey Price is an African-American male.

10.     Defendant Ricasa is female, petite even for a female,  and under 5 feet tall; whereas Plaintiff is approximately 6 feet tall, and by his own admission, athletic and  he engages in many sports.

11.     Defendant Ricasa was never the Plaintiff's supervisor, she was only his co-worker.

12.     Plaintiff in his Complaint filed in this case on March 15, 2007, admitted that during his first year of employment with Defendant MWCOG, Defendant "Ricasa and I gained a mutual working respect and friendly working  relationship. Ms. Ricasa would offer to buy me lunch or share breakfast with me almost daily" Plaintiff in his Complaint alleges that Defendant Ricasa attitude towards him did not change until August, 2005.

3

13.    The Equal Employment Opportunity Commission ("EEOC") made a no probable cause finding – that there was no evidence that Defendant MWCOG violated the law, and the EEOC issued a right to sue notice to Plaintiff for his EEOC charge, upon which this lawsuit is based on, on November 16, 2006. The finding and notice are Exhibit 2 attached hereto.

14.    Plaintiff received the EEOC notice identified in paragraph 13 on or before December 1, 2006.

15.    Plaintiff's Complaint in this case was not filed by the clerk until March 15, 2007.

16.    While not required to do so, and not at all the norm, Defendant MWCOG gave Plaintiff a salary advance of $3,000 in July, 2005 when he claimed a family emergency as reflected in Exhibit 3 attached hereto.

17.    Defendant Ricasa on October 13, 2005 made a complaint to Defendant MWCOG claiming that Plaintiff sexually harassed her as described in Exhibit 4 attached hereto. On October 17, 2005 Defendant MWCOG gave Plaintiff a written disciplinary warning based on Plaintiff's conduct as described in Exhibit 5 attached hereto.

18.    Plaintiff had performance problems while working for Calvin Smith, both directly and indirectly, through Nancy Rea. Exhibit 6 attached hereto reflects Defendant MWCOG's view of the performance problems during Plaintiff's last nine months working at Defendant MWCOG. While Nancy Rea was Plaintiff's direct supervisor during this time period, Mr. Smith's own experience with Plaintiff during this time period confirmed Ms. Rea's complaints about Plaintiff. Thus, Ms. Rea's comments were not at all determinative, but rather Mr. Smith relied upon his own observations and interaction with Plaintiff to make the decision that the Plaintiff's employment with Defendant MWCOG needed to end. Indeed, Ms. Rea's complaints

4

as to Plaintiff were the same kind of problems Mr. Smith experienced when Plaintiff reported

directly to Mr. Smith.

19.    Plaintiff alleges Defendant Ricasa  assaulted Plaintiff on January 20, 2006.

Defendant Ricasa denied the assault occurred and sent a denial memorandum to Defendant

MWCOG, exhibit 7 attached hereto.  Defendant MWCOG could find no evidence that Defendant

Ricasa assaulted Plaintiff, other than Plaintiff's claim.  Exhibit 8 attached hereto is a

memorandum Defendant MWCOG gave Plaintiff on January 26, 2006, reflecting Defendant

MWCOG's response to Plaintiff's claim that Defendant Ricasa assaulted him. The only witness

Plaintiff identify to the alleged assault was Owais Rafique, but Mr. Rafique denied to the

MWCOG investigator that he witnessed anything.

20.    Plaintiff has no evidence that Defendant Ricasa intentionally closed a door on

Plaintiff's hand.

21.    Exhibits 3 through 8 are true and accurate copies of business records kept in the

ordinary course of business.

## ARGUMENT

I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
CLAIMS OF DISCRIMINATION

The Plaintiff is an African-American male whose employment was terminated (the

Plaintiff resigned instead of being fired) by an African-American male, who was also the same

person who hired the Plaintiff.  The Plaintiff's employment was ended  for well documented

performance problems.  He was replaced by an African-American male.  Thus, an African-

American male hired the Plaintiff, the same African-American male made the decision to

terminate the Plaintiff's employment, and he replaced the Plaintiff with an African-American

male.  Based on these facts, summary judgment dismissing the case is warranted.

5

Summary judgment is, of course, appropriate when there is no genuine issue of fact. Federal Rule of Procedure 56(c) provides that a party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). As the Supreme Court stated in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules of Civil Procedure as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action;." Id. at 327 (quoting Fed. R.Civ. P. 1).

Summary judgment is appropriate when the plaintiff fails to make a showing sufficient to establish the existence an essential element to their case and on which they have the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). As the Seventh Circuit has noted: "It is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained." Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983). The Fourth Circuit has noted an "affirmative obligation" on trial courts to prevent factually unsupported claims from proceeding to trial. Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

To establish intentional discrimination on the basis of race or gender under Title VII, Plaintiff bears the initial burden of either producing direct evidence of employment discrimination or creating a presumption of discrimination under the familiar McDonnell Douglas burden-shifting standard. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). In the absence of direct evidence of employment discrimination, Plaintiff must first establish the elements of a *prima facie* case of discrimination in order to raise an inference of discrimination. If Plaintiff is able to meet his *prima facie* burden, then the burden of production

6

shifts to Defendants to proffer evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. Id.

Once Defendants articulate legitimate, nondiscriminatory reasons for its actions, any inference of discrimination created by the *prima facie* case "drops out of the picture." St. Mary's Honor Center vs. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993).. Plaintiff can survive summary judgment only by presenting facts sufficient to support a finding that Defendants asserted reasons are false and that discrimination was the real reason for Defendants' actions. Jones v. Washington Metropolitan Area Transit Authority, 946 F. Supp. 1023, 1025 (D.D.C. 1996); Devera v. Adams, 874 F. Supp. 17, 21 (D.D.C. 1995). Thus, it is not necessarily enough for the Plaintiff to merely cast doubt on Defendants stated reasons. The evidence presented by Plaintiff must be sufficient to allow a reasonable jury to find that the articulated reasons are a pretext for intentional discrimination. Hicks, 509 U.S. at 508.

"Pretext" does not simply mean a mistake; it means a "lie" intended to cover a discriminatory motive. Russell v. Acme Evans Corp., 51 F.3d 64, 68 (7th Cir. 1995). Many courts have recognized that employer errors in the assessment of qualifications do not prove pretext, and that it is not the factfinder's province to judge what qualifications are, or should be, important for the employer. See, e.g., Odom v. Frank, 3 F.3d 839, 845 (5th Cir. 1993); Jackson v. Harvard Univ., 900 F.2d 464, 468 n.2 (1st Cir.), cert. denied, 498 US. 848 (1990); Waterhouse v. District of Columbia, 124 F. Supp 2d 1, 10 (D.D.C. 2000).

To withstand summary judgment, Plaintiff must not only show, through admissible evidence, that Defendants proffered reasons for its actions are false, he must also present some evidence that race or gender was a determining factor in the decision. See Woodruff v. DiMario,

164 F. Supp. 2d 1, 7 (D.D.C. 2001); St. Mary's Honor Ctr. v. Hicks,  509 U.S. 502, 507-508, 113

S. Ct. 2742, 2747 (1993).

 That the Defendant may have made an unfair or bad decision is irrelevant.  The courts

"may not 'second-guess an employer's personnel decision absent demonstrating discriminating

motive'…the issue is not 'the correctness or desirability of [the] reasons offered…[but] whether

the employer honestly believes in the reasons it offers.'"  Fischbach v. District of Columbia

Dep't. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1982); Richard v. Bell Atlantic Corp., 167

F. Supp. 2d 34, 40 (D.D.C. 2001) (granting employer's motion for summary judgment on

plaintiff's discriminatory failure to promote claim); Woodruff v. DiMario, 164 F. Supp. 2d 1, 7

(D.D.C. 2001); Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 6 (D.D.C. 2000) ("a

district judge does not sit as a super-personnel department that reexamines an entity's business

decisions.").

 Plaintiff's opinion that he was treated unfairly is irrelevant.  See Waterhouse v. District of

Columbia, 124 F. Supp. 2d 1, 7 (D.D.C. 2000).  That Plaintiff may have been unhappy that he

did not receive the promotion and believed that he was better qualified simply does not establish

discrimination. See Healy v. New York Life Ins. Co., 860 F.2d 1209 (3d Cir. 1988), cert. denied,

490 U.S. 1098 (1989).  "[P]laintiff's perception of [himself], and of [his] work performance is

not relevant.  It is the perception of the decisionmaker which is relevant." Waterhouse, 124 F.

Supp. 2d at 7 (quoting Smith v. Chamber of Commerce, 645 F. Supp. 604, 608 (D.D.C. 1986)).

Where, as here, the record supports the conclusion that the employer based its employment

decision on a good faith belief that the plaintiff's job performance was inadequate, the court

cannot find pretext.  See Waterhouse, 124 F. Supp. 2d at 10 (granting summary judgment for

employer on plaintiff's discrimination claim).

8

The ultimate burden of proof is at all times upon the Plaintiff to show that he was the victim of intentional discrimination. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 153, 120 S.Ct. 2097 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993). Where the Plaintiff can not present evidence establishing discrimination, summary judgment is appropriate: "The salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829 (1985); see also Richardson v. National Rifle Ass'n, 871 F. Supp. 499, 501, 503 (D.D.C. 1994) (granting summary judgment because "evidence of discrimination that is merely colorable or not significantly probative cannot prevent the issuance of summary judgment"). As explained in Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), "the mere existence of alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48. See Currie v. Lujan, No. 92-5183, 1992 U.S. App. LEXIS 36682, *1 (D.C. Cir. Dec. 10, 1992) (plaintiff "failed to establish a *prima facie* case of race discrimination because he was unable to show that the individual promoted was not a member of his protected group."); Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 10 (D.D.C. 2000) (summary judgment for employer granted where employer submitted evidence that it reasonably believed plaintiff had performance deficiencies justifying her termination).

Finally, where as the case herein, the same person who hired the Plaintiff also made the decision to fire the Plaintiff, there is a strong inference against a finding of discrimination. This is even more the case herein where that person is the same race and gender as the Plaintiff, and the claim is for race and gender discrimination. Waterhouse v. District of Columbia, 124 F.

9

Supp. 2d 1, 12 (D.D.C. 2000) ("the Court finds persuasive the fact that the same group of management officials who fired plaintiff also hired her only a short time before (11 months), thereby raising a presumption or inference of non-discrimination."); Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991); (noting that "employers who hire workers within a protected group seldom will be credible targets for charges of pretextual firing"); Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996); Rand v. CF Inds., Inc., 42 F.3d 1139 (7th Cir. 1994) (noting that the hiring and firing of an employee within a protected class by a common actor would make it suspect that the employer "had suddenly developed an aversion to older people" shortly after hiring plaintiff); Davis v. CSC Logic, Inc., 82 F.3d 651 (5th Cir. 1996) (applying same-actor presumption); Grady v. Affiliated Cent., Inc., 130 F.3d 553 (2d Cir. 1997) (noting that the hiring and firing by the same actor makes it "difficult to impute to the [actor] an invidious motivation that would be inconsistent with the decision to hire"); See also Le Blanc v. Great American Ins. Co., 6 F.3d 836 (1st Cir. 1993); Mitchell v. Data General Corp., 12 F.3d 1310, 1318 (4th Cir. 1993). As the Eight Circuit noted, "employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." Lowe v. J. B. Hunt Transp., Inc., 963 F.2d 173, 174-75 (8th Cir. 1992). Indeed, making the claim even more frivolous, the person who replaced the Plaintiff was the same race and gender as the Plaintiff, and thus the Plaintiff can not even make a *prima facie* case of discrimination.

The Plaintiff may argue that Mr. Smith was influenced by Nancy Rea, and that she is not African-American nor male. However, the Courts have held that the key factor is who is the decision maker, and not who may or may not have influenced the decision maker. Mr. Smith in his affidavit notes that Ms. Rea's comments were not determinative, but they merely were the same as Mr. Smith's own experience with and observation of the Plaintiff (moreover, there is no

10

evidence Ms Rea had any discriminatory motive). Indeed, the courts have noted that the fact that a person who gives input into the decision maker may have a discriminatory motive is irrelevant, since the question is whether the decision maker made a discriminatory decision. See e.g. Hill v. Lockheed Martin Lgoistics Mgmt, Inc., 354 F.3d 277, 291 (4th Cir. 2004) (holding a claim against an employer, based on the discriminatory actions of employee who does not make the final or formal employment decision, will not succeed "Simply because [the employee] had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision."). See also Cutshall v. Potter, 347 F. Supp. 2d 228, 239-240 (W.D.N.C. 2004) wherein the court applied the same actor inference, even where the decision maker was allegedly influenced by a discriminatory person. Likewise, courts have applied the same actor inference in cases where there were multiple persons who made the termination decision, even where one of the decisionmakers allegedly acted discriminatorily. See, e.g., Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183-84 (10th Cir. 2006) (applying inference where "most" of the termination decisionmakers also hired plaintiff, despite the fact that one of the decisionmakers allegedly made discriminatory comments).

Moreover, even if Ms. Rea was the decision maker, the Plaintiff does no better. The Plaintiff testified Ms. Rea asked to have the Plaintiff work for her and she sought him out, and for several months there was no problem between Ms. Rea and the Plaintiff. The problem only started when the Plaintiff sent an e-mail to the Executive Director complaining that his hand injury was not being taken seriously. Thus, even if the Plaintiff can present evidence that Ms. Rea was the decision maker (and it is unclear how he would know what Mr. Smith based his decision on and thus how to refute Mr. Smith's affidavit), the Plaintiff is limited by the case law that if the same person hires and fires a person, there is a strong inference that there was not a

11

discriminative motive. Moreover, at his deposition, the Plaintiff admitted that of the 15 or so

Administrative Assistants (Plaintiff's job) at the Defendant, 14 were African American.

One can thus hardly imagine a more frivolous case than the one herein. The Plaintiff

alleges he was forced to resign his employment because of his race of African-American and

gender of male. However, the person who forced him to resign his employment is an African-

American male, and the person who replaced him is an African-American male. Virtuanlly all

the persons in the Plaintiff's job at the Defendant are African-American, hardly a sign of race

discrimination. Indeed, the same person who hired the Plaintiff also made the decision to

terminate his employment. The Plaintiff's employment was terminated for well documented

performance problems, and there was no evidence any of the persons involved had any

discriminatory motive. Indeed, since the Plaintiff was replaced by an African-American male,

the Plaintiff can not even make out a prima facie case of discrimination since he was replaced by

a person who is the same race and gender as the Plaintiff. Likewise, the Plaintiff has no evidence

the reason for the termination of his employment was pretextual. Lastly, no reasonable fact

finder could conclude that the Plaintiff's race or gender was the reason for the termination of his

employment, where the same person hired and fired the Plaintiff, and that person is the same race

and gender as the Plaintiff. Thus, summary judgment is warranted.

II.    IN THE ALTERNATIVE, DEFENDANT RICASA SHOULD BE DISMISSED FROM
       THE TITLE VII CLAIM AS A DEFENDANT BECAUSE SHE MAY NOT BE HELD
       PERSONALLY LIABLE UNDER TITLE VII

The Title VII claim against Defendant Ricasa must be dismissed. Title VII prohibits

discriminatory employment practices, such as discrimination based on race, sex, or national

origin. Liability for unlawful discrimination is imposed on employers, as that term is defined by

the statute. Title VII defines an employer as a person who employees 15 or more individuals,

and that person's agents. 42 U.S.C. §2000e(b). The case law is clear that supervisors have no

12

personal liability under Title VI, and moreover, Defendant Ricasa was not even the Plaintiff's

supervisor, she was his co-worker. As such the Title VII claim against her must be dismissed.

In Gary v. Long, 59 F.3d 1391 (D.C. Cir.). cert. denied, 516 U.S. 1011 (1995), the United

States Court of Appeals for the D.C. Circuit held that Title VII does not impose individual

liability on supervisory employees. Gary alleged that Long, one of her supervisors, had engaged

in a pattern of sexual harassment, including threatening Gary with termination of her

employment, if she did not submit to Long's advances. Id. at 1394. Nevertheless, the Court held

that, under Title VII, Long could not be held personally liable for his alleged conduct:

> Thus, while a supervisory employee may be joined as a party
> defendant in a Title VII action, that employee must be viewed as
> being sued in his capacity as the agent of the employer, who is
> alone liable for a violation of Title VII.
>
> *    *    *
>
> Considering the evidence in the light most favorable to Gary, we
> find that Long qualifies as an employer under Title VII because he
> served in a supervisory position. *Because Long cannot be held
> liable in his personal capacity, however, Gary's claim essentially
> mergers with her claim against WMATA.* Accordingly, we
> conclude that *the magistrate judge did not err in dismissing Gary's
> Title VII claim against Long.*

Id. at 1399 (emphasis added). See also, Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir.

1991); Jones v. District of Columbia, 346 F. Supp. 2d 25, 40-41 (D.D.C. 2004); Stack v.

Turnage, 690 F. Supp. 328 (M.D. Pa. 1988); Bradley v. Consolidated Edison Co., 657 F. Supp.

197, 207 (S.D. N.Y. 1987).

Moreover, of course, Defendant Ricasa did not even supervise the Plaintiff. Thus,

Plaintiff cannot maintain a Title VII cause of action against Ricasa personally, and Ricasa should

be dismissed from this action as a Defendant to the Title VII claim.

III.    THE ASSAULT CLAIM AGAINST DEFENDANT RICASA SHOULD BE
        DISMISSED BECAUSE THERE IS NO EVIDENCE HER CONDUCT WAS

INTENTIONAL, AND THUS THE PLAINTIFF'S EXCLUSIVE REMEDY IS
WORKER'S COMPENSATION BENEFITS

An injury caused by a co-worker is covered by workers' compensation, and workers'

compensation is the exclusive remedy unless the conduct of the co-worker was intentional. D.C.

Code § 32-1504. Thus, the claim against Defendant Ricasa is barred by the workers'

compensation exclusivity provision, unless the Plaintiff can prove that Defendant Ricasa

intentionally injured him. Houston v. Bechtel Associates Prof. Corp., 522 F.Supp. 1094, 1096

(D.C. 1981) ("the common law liability of the employer cannot be stretched to include accidental

injuries caused by the gross, wanton, willful, deliberate, intentional, reckless, culpable, or

malicious negligence, breach of statute, or other misconduct short of genuine intentional

injury…nothing short of a specific intent to injure the employee falls outside the scope of

§ 905(a)" – exclusivity bar); Grillo v. National Bank of Washington, 540 A.2d 743 (D.C. 1988).

The Plaintiff has merely alleged Defendant Ricasa closed a door on his hand. While

Defendant Ricasa denies she even pushed the door on Plaintiff's hand, there is absolutely no

evidence that even if she did, that it was anything more than an accident. As such, workers'

compensation is the Plaintiff's exclusive remedy, and the assault claim against Defendant Ricasa

should be dismissed.

IV.    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE IT IS UNTIMELY

The EEOC issued a Dismissal and Notice of Rights, also known as a right to sue letter,

on November 16, 2006 (Exhibit 1 to the Statement of Material Facts). The notice advised

Plaintiff that any lawsuit based on Collins' allegation of discrimination must be filed within

ninety days of receipt of the notice. The notice was presumably received by Plaintiff three days

later. Sherlock v. Montefiore Medical Center, 84 F.3d, 522, 525 (2d Cir. 1996). Three days

after November 16, 2006 was Sunday, November 19, 2006. Thus, Collins is presumed to have

14

received his right to sue letter on Monday, November 20, 2006.  Ninety days after November 20, 2006 was Sunday, February 18, 2007.  February 19, 2007 was a federal holiday.  Thus, Collins' Complaint was required to be filed no later than Tuesday, February 20, 2007.  It was not, however, filed by the clerk until almost one month later on March 15, 2007.

Plaintiff's failure to bring this lawsuit within ninety (90) days of the EEOC's final determination on his administrative charge renders his Complaint untimely.  *See* 42 U.S.C. §2000e-5(f)(1) (an allegedly aggrieved party has 90 days to institute civil suit).  Here, Plaintiff filed his Complaint more than 100 days after receiving the EEOC's right-to-sue notice.  Accordingly, Plaintiff's Complaint must be dismissed as a matter of law.  Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 n.3 (D.D.C. 1998) (affirming dismissal when plaintiff filed on the 92nd day after receipt of the EEOC notice of right to sue).

A plaintiff's *pro se* status does not excuse his failure to meet a statutory filing deadline.  See Jones v. Phipps, 39 F.3d 158, 163 (7th Cir. 1994) ("pro se litigants are not entitled to a general dispensation from the rules of procedure or court imposed deadlines"); see also Henthorn, 29 F.3d at 684 ("a *pro se* complaint, like any other, must present a claim upon which relief can be granted by the court.").  Because Plaintiff's Complaint is untimely it should be dismissed and judgment should be entered in favor of MWCOG and Ricasa.

CONCLUSION

Defendants' motion for summary judgment should be granted.

Respectfully submitted,

METROPOLITAN WASHINGTON COUNCIL
OF GOVERNMENTS and MARIE RICASA

By _____ /s/ Lawrence P. Postol _____
Lawrence P. Postol, DC Bar No. 239277

15

James M. Mesnard, DC Bar No. 404385
Their Attorneys

SEYFARTH SHAW LLP
815 Connecticut Avenue, N.W., Suite 500
Washington, DC  20006-4004
(202) 463-2400

Dated:  February 4, 2008

DC1 30201435.3

<u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing Defendant's Memorandum of Points and

Authorities in Support of their Motion for Summary Judgment was served by first class mail,

postage prepaid, this 4th day of February 4, 2008, upon:

                  Madison Collins, Jr.
                  7157 Marbury Court
                  District Heights, MD 20747

                                    /s/ Lawrence P. Postol
                                      Lawrence P. Postol

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA <br> ☒ EEOC | 570-2006-01302 |

| | and EEOC |
|---|---|
| Washington Office Of Human Rights | |
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Madison Collins, Jr. | (301) 559-8243 | 05-14-1965 |

| Street Address | City, State and ZIP Code |
|---|---|
| 5459 16th Ave, #101, Hyattsville, MD 20782 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| METROP. WASHINGTON COUNCIL OF GOVT | 15 - 100 | (202) 962-3200 |

| Street Address | City, State and ZIP Code |
|---|---|
| 777 N. Capitol St Ne,  Suite 300,  Washington, DC 20002 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN <br> ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.) | Earliest **06-01-2006**   Latest **06-16-2006** <br> ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began working for Respondent in December 2003 as an Administrative Temp.  I became a permanent employee around July 2004. On January 20, 2006, during a meeting in COG's board room Administrative Assistant Marie Ricasa (Asian) pushed the rear board room lounge door on to my hand, hitting my hand causing it to be cut, bruised and swollen then proceeded to push the door closed on me crushing my hand and body with me in the door way until the door was closed.  I immediately reported the incident to Health Chief Nancy Rea (White) and HSPPS Director Calvin Smith (Black) were attending the meeting. Human Resource Director Imelda Roberts (Asian) Director Smith, Human Resource Representative Janet Ernst (Asian) and Ms. Robert interrogated me about this incident in a manner that suggested they questioned my credibility. To my knowledge, no corrective action was taken. In early June 2006. Director Smith requested that I train my replacement, informing me that I would be terminated effective mid-June 2006.

I believe that I have been discriminated against based on my race (Black) and my gender (male) in violation of Title VII of the Civil Rights Act of 1964, as amended

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Aug 02, 2006**  _Date_   _Charging Party Signature_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

Exhibit 1

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Madison Collins, Jr.<br>7157 Marbury Ct.<br>District Heights, MD 20747 | From: Washington Field Office - 570<br>1801 L Street, N.W.<br>Suite 100<br>Washington, DC 20507 |
|---|---|

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |  |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 570-2006-01302 | Janet Stump,<br>Enforcement Supervisor | (202) 419-0700 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ]  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ]  While reasonable efforts were made to locate you, we were not able to do so.

[ ]  You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Janet A. Stump for*

Dana Hutter,
Director

NOV 16 2006

(Date Mailed)

Enclosures(s)

cc:    Imelda Roberts
Human Resources Director
METROPOLITAN WASHINGTON COUNCIL OF
GOVERNMENT
777 N. Capitol Street, NE
Suite 300
Washington, DC 20002

Exhibit 2

7/13/2005

Ms. Imelda Roberts
Director Human Resources
COG

Dear Imelda:

I am writing this note to you to request a small advance for a family emergency.  Imelda, I am currently going through some marriage issues that are irresolvable at this time. I have two children who are at the heart of this sad situation who need to have a new home.  Since my separation, my wife has been living with her mother and now they have to move because of her mother's lease.  I have been struggling since the separation financially to make ends meet with having to pay for child support and daycare and to just live and work so I can take care of my responsibilities.  I recently had two deaths in the family that exhausted the small savings I had, because of the travel cost to attend the funeral.  I know this is not normal procedure for COG to assist in this way, but I don't have anyone else to turn to right now.  I am requesting, if possible a $3,000 advance that I will pay back over 8 months @ $375 per month or $187.50 per pay period.

I thank you in advance for any assistance you can grant.

Sincerely,

*Madison Colle*

Madison Collins Jr.

*$2000- Approved*

Exhibit 3

Date:   October 17, 2005

To:     Ms. Imelda Roberts

Thru:   Mr. Calvin Smith

From:   Marie Ricasa

Last Thursday, October 13, Mr. Calvin Smith, HSPPS Director, met with me and my 2 co-workers, Ms. Rene Farrish and Mr. Madison Collins.

Previous to this I spoke with Mr. Smith about improper behavior of my co-worker, Mr. Madison Collins, and concerns about my safety.

Why this meeting was called
A few weeks ago I was asked by Ms. Bempong to take care of registration for the October 28 training. I was also tasked to do other things related to this training. She mentioned that Mr. Collins will do the rest.

Mr. Collins then informed me that he will take over the task in the future, and requested that I explain and walk him through the process, particularly the training workbook. While I was showing him the workbook, he leaned towards the computer screen. I felt uncomfortable but I continued. When he put his left hand over my shoulder and his head closer I told him "don't do that", and reminded him that in the past I told him I feel uncomfortable when he does that. And he did.

(There were incidents in the past where he would come and put his hands on my desk, enclosing me in the process, and told him to take it off. I didn't go to my supervisor because I made it clear to him that this is not proper behavior.)

After that I tried to minimize contact with him; however, he either called or came to me to talk about the same thing over and over (i.e., catering), so I finally told him I need not know and this is his ballgame.

He then approached me about other things like certificates (letter from NASW, hours to put) and about registering people who left messages on his voicemail. I told him he could register these people himself as practice. He insisted that I walk him through the process again and I refused as I do not want a repeat of the same incident. He did not take this lightly and warned that he will tell the project manager (Ms. Nancy Rea) that I refused to help him.

The following day, around mid-afternoon, when I was doing my work quietly facing towards the window, he suddenly came, put his hands on my shoulders and his head beside me with his mouth on my ears and said "You love me, don't you." I then reacted by telling him "Don't touch me! and do not ever touch me again! I told him it is improper behavior and if he does it again I will charge him with harassment. He laughed and said it was a joke and besides: "Who will

- 1/2 -

Exhibit 4

believe you, no one saw me do it." This statement scared me because it is true—no one was in my area at that time—and it clearly shows he will not stop doing it. It was very disturbing.

After that, he would find more excuses to approach me but I made it a point to get out of my work space. Before a meeting with Ms. Rea last week, he made some work-related accusations, undermining my work, and I realized it is his way of making me work closely with him again. Since I am feeling more uncomfortable and it is clear that his misbehavior is escalating, I told him in an angry manner, after the meeting, not to touch me again.

That day, Wednesday (October 12), I finally told our director, Mr. Calvin Smith, about the incident and expressed concern about my safety because of what he told me about an altercation with a staff in transportation and other stories in the past.

The following day, Thursday (October 13), Mr. Smith met with Mr. Collins, Ms. Farrish, and me and told us to respect each others work space, and made it clear that Mr. Collins should not go into my work space (as I requested). I also requested that I be relieved of work related to the October 28 training to avoid further contact with Mr. Collins, and Mr. Smith consented.

The following day, Friday (October 14), around lunch time while I was proofreading a document for Mr. McMillion, I was startled seeing him suddenly right beside me in my work space. I reminded him that he was told not to do that and he just made faces and left. I realized that (as in past incidents) no one was in my immediate area and he took this opportunity to do what he did. I immediately went to Ms. Rea (Mr. Steve Dickstein was in her office at that time) and reported the incident and Ms. Rea went to Mr. Collins' work area. I followed but kept my distance, and again told Ms. Rea he should be stopped. At this point he told me to "take a pill".

Apparently, he did not take the meeting with Mr. Smith seriously, and blatantly showed complete disregard for Mr. Smith's instructions and that he can do as he pleases, particularly when no one is around. This made me more concerned about my safety.

Ms. Rae and Mr. Dickstein went to Personnel (Ms. Ernst's office) and I followed them, and I narrated the incident to Ms. Ernst. We met again with Mr. Smith around mid-afternoon.

This memo is to put on record my concern about my safety and request that something be done about Mr. Collins' improper behavior.

# METROPOLITAN WASHINGTON  COUNCIL OF GOVERNMENTS

*Local governments working together for a better metropolitan region*

District of Columbia
Bowie
College Park
Frederick County
Gaithersburg
Greenbelt
Montgomery County
Prince George's County
Rockville
Takoma Park
Alexandria
Arlington County
Fairfax
Fairfax County
Falls Church
Loudoun County
Manassas
Manassas Park
Prince William County

October 14, 2005

TO: Madison Collins
FROM: OHRM
RE: Disciplinary Warning
CC: Calvin Smith, Steve Dickstein, Nancy Rea

It has come to our attention that on October 13th 2005, Calvin Smith, held a meeting with Marie Ricasa, Renee Farrish and yourself to discuss alleged complaints regarding your inappropriate behavior towards Marie Ricasa and Renee Farrish. During this discussion, Calvin Smith, Director of HSPPS, clearly stated that it was inappropriate and unprofessional to make unwelcome physical contact with your female co-workers and that this behavior must cease immediately. You were further warned to stay out of Marie Ricasa's work area and to not engage in any verbal or physical contact with her unless it was work related. Today, we received another report that you went into Marie's Ricasa's work space and antagonized her.

In COG's administrative and Human Resources Manual, Section 6-1 A, our policy clearly states:

Harassment
A. Statement of Policy

*COG expressly prohibits any harassment of any COG employee based on race, color, religion, sexual preference, national origin, age, disability, status as a Vietnam-era or special disabled veteran, or status in any group protected by state or local law. Harassment is a form of discrimination under Title VII of the Civil Rights Act of 1964 and the D.C. Human Rights Act. All managers and supervisors have been instructed to report to the Director, Office of Human*



Exhibit 5

*Resources Management as soon as they have become aware of any conduct that may constitute harassment, including sexual harassment as defined in Section B below. Any employee of COG found in violation of these rules and policies shall be subject to appropriate disciplinary action, up to and including termination.*

B.  Sexual Harassment

1.  *The Metropolitan Washington Council of Governments (COG) will neither accept nor condone any conduct or behavior which constitutes sexual harassment in the workplace. All managers and supervisors have been advised of their responsibilities to assure that the COG workplace is free of any such attitudes and behaviors. Any employee of COG found in violation of these rules and policies shall be subject to appropriate disciplinary action, up to and including termination.*

2.  *Definitions*
    *Sexual harassment is discrimination under title VII of the Civil Rights Act of 1964. The Equal Opportunity Commission defines sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:*

    a.  *Submission to such conduct is made either implicitly or explicitly a term or condition of an individual's employment;*
    b.  *Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting the individual; or*
    c.  *Such conduct has the purpose or effect of reasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment."*

This memo is formal notice that we are conducting an internal harassment investigation into actions that you inappropriately touched Marie Ricasa. When a complaint of this nature is brought to OHRM, it is our duty to confidentially investigate all sides of the allegations and to obtain a written statement from both the employee filing the claim and the employee who the claims are being brought against. Witness statements will also be collected when applicable and a final determination will be made after all facts are gathered and analyzed.

Please refer to Section 6-2, Complaint Procedure, in COG's Administrative and Human Resources Manual for further details regarding this process.

This memo acknowledges receipt that I have been formally informed that a harassment complaint has been brought against me and that I will be asked to provide written documentation regarding my actions. I further understand that by signing this memo, I am only acknowledging that I received this notification and that a final determination will be presented to me after all the facts of this case has been collected and reviewed by appropriate management staff.

| | |
|---|---|
| Employee Acknowledgement | 10/18/05<br>Date |
| Director's Signature | 10/21<br>Date |
| OHRM Representative | 10/18/05<br>Date |

Summary of Madison Collins' Work Issues, September 2005 through June 2006
By
Nancy Rea, Chief, Health and substance Abuse Section

During the 9 months that Madison Collins reported to me as part of the health team, there was a constant, on-going history of resistance to supervision. He wanted to spend his time on the tasks he preferred, rather than the tasks that were of the highest priority, and put forth many reasons for not being productive.

One task that was to be a major responsibility was keeping the outlook distribution lists and contact lists updated. He was to up-date the lists from sign in sheets and from email bounces, as well as adding new contacts from business cards. He used multiple strategies to avoid doing this task, complaining that it was too time consuming. The temporary administrative assistant who was brought in at the end of Madison's employment completed the initial update in less than one day, and provided updates after each meeting or mailing within one day.

In the early weeks of his assignment, Madison was frequently away from his desk without justification. He had responsibility for relieving the receptionist at certain times. The receptionist complained to me, both directly and through Carl Kalish, that Madison did not show up on time to cover the reception desk. Dave McMillion complained that Madison was late for setting up a large UASI function. I coached Madison on being where he was supposed to be when he was supposed to be. Although he eventually complied somewhat with the request to be at his desk, he expressed resentment, and continued to be late arriving frequently. In one month that I recorded, he was late at least one day per week. He tended to phone in about 20-30 minutes after he should have been here to say he was running late. At the last meeting in May, he said he wasn't responsible for being late because the bus was frequently late. However, his excuses were varied, including, in addition to the late bus, a broken garbage disposal, a broken lock on his door, various emergencies or duties with his children, and various ailments. I expressed concern over both the pattern of frequency and the lack of notification. In our couching sessions I suggested that if he was not on the bus at the normal time he knew he would be late and should call,

He complained that he had trouble concentrating because his desk was in a cubicle near the copier and printer. I suggested he use headphone with music to block out distractions. In April I arranged for him to move to one of the desks in the new intern office, which might offer fewer distractions. Although he listed more than 6 hours on his time management log as "preparation to move" no progress was visible at the time he left.

One of the first tasks I assigned him was to figure out how long it took him to do certain specific tasks that repeat from time to time, so I could allocate an appropriate amount of work to him. He never was willing to work with me to provide these estimates and even at the final meeting in May, said that focusing on time for tasks was a waste of time. Unable to get his cooperation in a less formal way, in March I began requiring him to provide a daily log, based on the Franklin/Covey time management approach, with a prioritized list of tasks to be done each day followed up with a record of how much time was spend on each task. I presented this to him as a tool to document his productivity as a step towards increased compensation at his next performance review. As part of this process I asked him to provide a self-rating each day based on the COG performance review scale. He clearly resented this documentation. In the early weeks he rated himself in the 2-6 range on most scores most days. However, after I showed him how his ratings would play out in computing a merit increase in pay, he began to rate himself a 9 on all items. He did not turn in a self-rating on all days, and I noted that he tended to avoid rating himself on

Exhibit 6

days when his productivity was low. The daily log sheets were done for 6 weeks until the April 28, 2006 when an incident brought things to a crisis point.

In November our coaching sessions began to include how to avoid harassment charges and conflict avoidance and resolution.

Near the end of January I summarized, in a note to myself, the progress he had made and the challenges still ahead of him. I noted that

> he has improved his job performance and is cooperating with staff to increase his productivity. Progress has been made in addressing both performance and attitudes. He and I have had many discussions on planning for improved productivity, and he has followed up with development of systematic approaches to some tasks. The areas he does best in fall into two categories:
> - Meeting support in logistics such as setting up meeting rooms, making copies, ordering supplies and ordering food service
> - Customer service and in following up to requests for services and/or information.
>
> However, after five months of being coached on improving his job performance, he should be ready to work on this with less supervision and to take increased responsibility for planning and implementing improvement of his job performance and attitudes before the end of this fiscal year and his next performance review. The areas needing improvement fall into the following categories:
> - Punctuality in attendance
> - Time management skills
> - Limiting socializing
> - Meeting assignment deadlines
>
> I asked him to develop a work plan with goals and outcome measures for us to review and agree upon. As always, will be here to assist him, but am now going to step back and let him take the lead in managing your professional growth to meet expectations.

He was unable to produce the requested work plan, but did begin to discuss with me each day which tasks he should focus on.

On Friday, February 17, 2006, just as a Public Safety Policy Committee meeting was beginning, Madison came to me to say that he had been in the Boardroom lounge to get ice as part of setting up another meeting. Marie Ricasa was in the lounge setting up lunch for the PSPC. She would not allow him to take a cookie, and when he left by the back door she pushed the door closed against him and his hand was injured. Because I had previously told him to avoid being alone with Marie, I asked if anyone else has seen what happened. He said Owais Raffique was just entering the room at the time. I instructed him to report the incident to HR and asked him to send me an email describing the incident. I explained that I would be out of the office Monday, but would ask Calvin to talk to him. Later he came to me and said he was leaving to go to the doctor to have his hand and arm x-rayed. A few minutes later I spoke with Owais who said he had not seen anything. Later Madison would tell me that Marie smiled at someone else and offered a cookie to that person. However other than Owais he gave me no name on anyone who had been in the room.

Madison did not get his hand x-rayed until Monday. I heard reports that he played tennis over the weekend. After he had it x-rayed he said that it was "bruised." He mentioned the pain for a few days, but stopped complaining about it after that and did not indicate that it was causing any problem. Madison frequently spoke of physical problems such as indigestion, sore muscles, tooth aches, etc. In April or May he discussed with me his need for a primary care physician. After I gave him a suggestion on how to search the list of participating physicians, he made an appointment and had a physical. He told me afterward about the results of the physical, mentioning some other problems that had been identified, but said nothing about the injury to his hand. During this time period he continued to complain about how Marie had "assaulted" him, but did not mention any continuing pain. He occasionally spoke of the incident in February up until the time he left; however his remarks were confined to his concerns about people's actions and beliefs rather than any complaints of continuing pain. I frequently reminded him that the incident was an example of how difficult it is to prove what happens between two people when there are no other witnesses, and the need to protect himself from both victimization and false accusations.

On April 28, 2006 Madison was an hour late in arriving to set up for a special event. Among the tasks he was responsible for that morning were receiving the breakfast delivery from the caterer, , and getting the room unlocked for the presenters and sound system set up, which were all scheduled for 7:00 AM. Based on his past record, I decided to arrive early also. When he arrived later, and I objected to his being late, he became belligerent and started shouting at me in the public hallway outside the room as event organizers were doing the set up. He later was also loudly belligerent to Beth Nelson. At that point I decided to stop the coaching and put him on notice in writing that his behavior was unacceptable and could lead to termination. He refused to "read or sign anything." (see memo of April 28) When Madison refused to accept the memo I asked Calvin to either reassign him or begin the process for termination.

I understand that Calvin met with him and they reached an agreement. On May 1, 2006, Calvin, Madison and I met. Madison apologized for his unprofessional conduct. He said he really wanted to work at COG. Calvin stated that we were going to move beyond the incident and have a good month during which Madison "will do his job." And that during that month Madison would be looking for a new positions with Calvin's help.

At the end of May, a temporary assistant was hired and Calvin gave Madison additional time to find a new job prior to submitting a resignation. During the last two weeks prior to his resignation he was not in the office except on one occasion when he came in for a short time, wearing shorts and a tee shirt, on a day when he had said he had a job interview.

## HSPPS INTEROFFICE MEMORANDUM

**TO:**       MR. DAVID ROBERTSON, MR. CALVIN SMITH, MS. IMELDA ROBERTS, MS. JANET ERNST

**FROM:**     MARIE RICASA

**SUBJECT:**  ALLEGATIONS MADE BY MR. MADISON COLLINS

**DATE:**     JANUARY 23, 2006

My department director, Mr. Calvin Smith, and Ms. Janet Ernst of Human Resources spoke to me this morning about allegations made by Mr. Madison Collins. They showed me an e-mail sent by Mr. Collins last Friday to Mr. David Robertson, Ms. Imelda Roberts, Ms. Janet Ernst, and Ms. Larissa Williams.

I was shocked when I read the first paragraph e-mail and the first thing that came to mind was: this is another act of intimidation and retaliation to the complaint I filed with Personnel in October 2005 about his inappropriate behavior, and as a result of which he was given disciplinary warning and apologized through Ms. Nancy Rea.

May I state for the record that since I filed the complaint and in spite of his apology, I have been concerned for my safety (always looking over my shoulders when someone is behind me), at the same time trying to remain calm so I can function and do my job. It has been very stressful because of our respective work areas being in close proximity. Hence, this latest act on his part is very disturbing and unnerving.

About the complaint: Mr. Collins alleged that I closed the door of the Board Room lounge at him last Friday, January 20, after he got some ice from the ice machine and a cookie from the food table, thereby injuring him.

What happened last Friday, January 20, 2006:

I was at the Board Room lounge at around 11:30AM to make coffee and take care of the catering for the Public Safety Policy Committee Meeting (PSPC), backing-up my co-worker, Ms. Renee Farrish. I sat there for a while as there was a meeting going on before the start of the PSPC meeting, and we didn't want the participants of that meeting to think that the catering was for them. As I sat, reading a newspaper, Mr. Collins entered the room and took some ice from the machine, after which he went to survey the food at the table and then started picking up cookie after cookie to look at them. Even though I am always concerned for my safety when he is around, I remained calm (thinking there were a lot of people in the Board Room) and continued reading the newspaper. While Mr. Collins was still at the food table, Mr. Owais Raffique came in from the Board Room, followed by another person, so I stood up and told Mr. Raffique to help himself and get some lunch (since he was assisting us with the presentation for the meeting).


Exhibit 7

After a short while, some people (I didn't recognize) started going out via the lounge. When people came in and out of the lounge, once in a while I stood up and made sure the door was locked (quietly to avoid disruption), since in the past we have had incidents when people not involved in the meeting helped themselves with the food even before the participants. I don't remember when Mr. Collins left the lounge, nor closing the door when he left. I did not, as he alleged in his complaint, shut the door so hard so as to injure him, nor hear him say the things he stated in his e-mail. (An incident like he stated in his e-mail would have created a big commotion in the lounge and disrupted the proceedings at the Board Room.) When the previous meeting was over and more PSPC attendees started coming in the lounge, I left and returned to my work area. Later, on my way to the ladies room, I saw Mr. Collins coming in with a plateful of food. I took another way to the ladies room.

I want to put on record that from the time I filed my complaint, I have avoided any confrontation with Mr. Collins even as he made faces at me and mocked me when he sees me alone in the corridor or chance upon opening the door.

Throughout this ordeal, I have tried my best to remain calm, professional, and maintained proper office decorum. I take pride in the work I do and have done my work to the best of my ability, under extremely stressful condition.

Mr. Collins' latest act/accusation has intimated me so much that I am now more concerned not only for my safety, but for my life. Since this was brought to my attention, I have felt very disturbed, nervous and scared. I could not do my work, I could not concentrate, thinking what he would do next. I am afraid that his making false accusations will escalate to something more. This complaint was purely an act to intimidate and retaliate because of the complaint I filed.

I am therefore requesting Management to do something about the situation, so I can report to the office without fearing for my safety and my life. Last October, I have requested that I be relieved of any work that requires communication or interaction with Mr. Collins. However, since that time I have found Mr. Collins in some of the meetings I have assisted preparation for (example, public safety, PDCP, HSPC, PSPC). I am reiterating that request and further requesting a change in location of our work areas, since I have been working under extremely stressful environment since the time I filed my complaint because of the close proximity of our work areas.

TO: Madison Collins

FROM: Calvin Smith

RE: Incident on January 20, 2006

CC: OHRM, Dave Robertson, Lee Ruck

After a detailed investigation regarding your alleged complaint that Ms. Ricasa assaulted you in the boardroom lounge on January 30th, 2006; we have found that there are no witnesses that can either corroborate either your version of events or Ms. Ricasa's version of events. Due to the lack of corroborating evidence and lack of witnesses to this event, we are unable to make an affirmative determination of your complaint. We are aware that you injured your hand (how it was done, is unsubstantiated) and we did advise you of your rights to file a claim with Workman's Compensation. In fact, OHRM gave you the incident report three times, and you finally turned the form to OHRM on February 7, 2006. Your workman's compensation claim number for this injury has been filed and is YKYC1580. We also filed your emergency hospital room bills on your behalf to our Workman's Compensation Carrier.

With regard to your professional relationship with Ms. Ricasa, it has become clear to both myself and the staff of Human Resources who have spoken to you about this matter that there are personality and personal differences between the two of you that is causing an interruption between the normal work activities of the department. Because this situation is becoming more intolerable for both you and Ms. Ricasa, I am recommending that OHRM assist me with identifying training/and or EAP sessions that will assist you both with providing coping strategies with dealing with interpersonal relationships between the two of you including an anger management seminar. Please contact Janet Ernst to work with her in identifying appropriate resources to help you with your issues.

Finally, I also would like to emphasize former agreements made to keep both of your apart as much as possible and to avoid any interaction with each other until both of you have resolved any issues you may have against each other. Any work or communications that need to be handled between the two of you should go through your supervisor, Nancy Rea.

If you have any questions, please feel free to contact me.

Exhibit 8

June 23, 2006

Calvin L. Smith
Director, HSPPS
Metropolitan Washington Council of Governments
777 North Capitol St.
Washington, DC 20002

Dear Calvin:

It is with great sorrow that I am hereby tendering my resignation to you. *Effective June 30th, mej*

Although there is much to say, I believe the reasons leading to this decision are known by you, and I will therefore leave them unsaid at this time.

I appreciate having had the opportunity of being a member of the HSPPS department which you lead honorably for the 2 year period I worked for you. I offer my best wishes for your continued success.

Regretfully,

Madison Collins Jr.